UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>SULCO WAREHOUSING & LOGISTICS, LLC and SULLIVAN HOLYOKE PROPERTY ASSOCIATES, INC.,<br><br>　　　　　　Defendants. | Case No.<br><br>**COMPLAINT** |

## INTRODUCTION

1.　　Sulco Warehousing & Logistics, LLC ("Sulco") and Sullivan Holyoke Property Associates, Inc. ("Sullivan") discharged industrial stormwater from their transportation and warehousing facility at 311 Industry Avenue, Springfield, Massachusetts (the "Facility"). Sullivan owns and Sulco operates the Facility on approximately 16 acres of impervious surface.

2.　　Sulco and Sullivan (collectively the "Companies" or "Defendants") discharge industrial stormwater through the City of Springfield's municipal separate storm sewer system ("Springfield MS4") into Poor Brook, a tributary of the Chicopee River. Defendants have never applied for nor received a federal industrial stormwater discharge permit ("Stormwater Permit") for these discharges, as required by the federal Clean Water Act. 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act" or "the Act"), and they are not properly monitoring and controlling these discharges as is required by the Act.

3. Prior to reaching the Chicopee River, Poor Brook flows through the Delta Hills Conservation Area, the largest public open space in East Springfield. East Springfield has been designated by the Commonwealth and EPA as an environmental justice community because it has the potential to be disproportionately impacted by environmental harms and risks.

4. EPA has concluded that outdoor storage and parking of vehicles and transportation equipment is commonly associated with stormwater discharges containing pollutants such as oil, hydraulic fluids, arsenic, heavy metals, and fuel.

5. Rain and snow melt (jointly "stormwater") flow over the ground surface, motor vehicles, and other industrial equipment present at the Facility. Stormwater picks up pollutants at the Facility and carries those pollutants to Poor Brook via the Springfield MS4.

6. Defendants' discharges of stormwater to Poor Brook via the Springfield MS4 are in violation of the Clean Water Act. The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Defendants' illegal discharges of pollution.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

8. On August 19, 2020 the Commonwealth provided notice of Defendants' violations of the Clean Water Act, and of its intention to file suit against Defendants (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of

Environmental Protection ("MassDEP"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

9. More than sixty days have passed since notice was served.

10. This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

11. The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Defendants' activities. Defendants' continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

12. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## PARTIES

13. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

14. The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

15. Defendant Sulco Warehousing & Logistics, LLC ("Sulco") is a domestic limited liability company that lists its principle address as 311 Industry Avenue, Springfield, Massachusetts.

16. Sulco provides warehousing and shipping services to businesses including "many of the world's top Fortune 500 companies."

17. Defendant Sullivan Holyoke Property Associates, Inc. ("Sullivan") is a domestic for-profit corporation with its principle address listed as 39 South Broad Street, Westfield, Massachusetts. Sullivan owns the property where the Facility is located.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

18. The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

19. Stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, nutrients, metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people. Excess sediment clouds the water, makes it difficult or impossible for aquatic plants to grow, and destroys aquatic habitats. Excess nutrients cause algae blooms that reduce dissolved oxygen in the water column, harming fish and other aquatic organisms. Bacteria and other pathogens can wash into swimming areas and create health

hazards. Toxic pollutants can poison aquatic life. Land animals and people can become sick from eating diseased fish or ingesting polluted water.

20. To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general Stormwater Permit under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015).

21. Land transportation and warehousing facilities that discharge industrial stormwater to waters of the United States directly or through separate storm sewer systems are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-4.

22. The Stormwater Permit requires these facilities to, among other things:

   a. prepare a stormwater pollution prevention plan ("SWPPP") that, among other things, describes the facility and identifies all stormwater outfalls, Stormwater Permit, pg. 31;

   b. submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates, Stormwater Permit, Appendix G;

   c. ensure that pollutant control measures minimize pollutants in stormwater discharges, Stormwater Permit, pg. 14;

   d. locate materials, equipment, and activities to contain potential spills, Stormwater Permit, pg. 15;

   e. evaluate for and eliminate unauthorized non-stormwater discharges, Stormwater Permit, pg. 19;

    f. keep clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff, and keeping exposed areas free of waste, garbage, and floatable debris, Stormwater Permit, pgs. 15-16;

    g. ensure that stormwater discharges do not cause or have the reasonable potential to cause or contribute to a violation of water quality standards, Stormwater Permit, pg. 20;

    h. include specific SWPPP provisions applicable to land transportation and warehousing facilities, Stormwater Permit, pg. 135-136;

    i. conduct routine facility inspections at least quarterly (Stormwater Permit, pg. 22) and quarterly visual assessments (Stormwater Permit, pg. 24) to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not, Stormwater Permit, pgs. 22-26; and

    j. timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions, Stormwater Permit, pgs. 49-50.

*Citizen Suit Provision of the Federal Clean Water Act*

23. Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

24. The Commonwealth is a "citizen" within the meaning of Section 505(g) of the Act because it is a "person" having an interest which is or may be adversely affected. *See* 33 U.S.C. § 1365(g).

25. Under Section 505 of the Act, this Court has authority to enjoin Defendants' violations of the Act's prohibition on unauthorized discharges of pollutants and to require the company to comply with its Stormwater Permit. The Court also has authority to impose penalties of up to $53,484 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.4; 85 Fed. Reg. 1754 (Jan. 13, 2020).[1]

## STATEMENT OF FACTS

### Description of the Facility & Activities

26. The Facility is a land transportation and warehousing facility.

27. The Facility consists of approximately 17 acres of impervious surfaces and includes a 262,200 square foot warehouse.

28. Both Companies have been in operation since 1979.

29. The Companies store industrial equipment, including numerous tractors and trailers, on the Facility.

30. Pollutants such as oil, hydraulic fluids, arsenic, heavy metals, and fuel are commonly found in stormwater from transportation facilities where vehicles and/or other industrial equipment are stored and parked outside.

---

[1] The statutory maximum civil penalty for violations that occurred on or before November 2, 2015 is $37,500 per day, per violation. 40 CFR § 19.4, Table 1.

**Defendants' Discharge of Pollutants from the Facility**

*Polluted Industrial Stormwater Discharges to Poor Brook via the Springfield MS4*

31. Equipment and the ground surface at the Facility are exposed to precipitation.

32. Pollutants become mobilized by stormwater.

33. Water flows from the Facility into the City of Springfield's municipal catch basins ("Municipal Catch Basins") on Industry Avenue.

34. Water that enters the Municipal Catch Basins is discharged through the City of Springfield's MS4 into Poor Brook.

35. Since at least August 16, 2015, during the rain events listed on Attachment A, Defendants have discharged polluted stormwater off the Facility and into Poor Brook via the Springfield MS4.

*Potential Water Quality Impacts from Pollutants*

36. Excessive amounts of heavy metals in runoff pose a long-term threat to aquatic ecosystems, the food chain, and human health. Once introduced into the aquatic environment, heavy metals will mix in the water column, settle into sediments, or be consumed by biota. Heavy metals are readily dissolved in water, making them easily absorbed by aquatic organisms such as fish and invertebrates. Excessive levels of heavy metals in the aquatic environment can disturb organisms' growth, metabolism, and reproduction. The presence of heavy metals in bottom-sediment is a long-term source of aquatic contamination because the metals will be slowly released into the environment over time and will become re-mobilized in times of flooding or other disruptive events. Heavy metals tend to bioaccumulate, posing a threat to species higher up on the food chain, such as humans.

37. Arsenic is toxic to organisms even at low concentrations. Arsenic absorbs easily in plants, and then bioaccumulates in plant-eating aquatic species such as fish. Fish exposed to arsenic through environmental contact and ingestion suffer harms such as tearing and degeneration of skin, clogging or collapse of gills, gastrointestinal lesions, the alteration of behaviors necessary for survival, and death. Birds and other animals that eat fish containing high concentrations of arsenic then suffer from arsenic poisoning that often leads to death.

38. Oil, fuel, and hydraulic fluids are all petroleum hydrocarbons, a class of chemical compounds that originate from crude oil. Stormwater discharges containing petroleum hydrocarbons can cause substantial deterioration of aquatic ecosystems. When hydrocarbons, such as oil, float on top of surface water it blocks light and prevents aquatic plants from being able to photosynthesize, causing ecosystem degradation and habitat destruction. Pollution from oil, fuel, and hydraulic fluids also interfere with aquatic animals' ability to perform actions crucial to their survival. Even at low levels, petroleum hydrocarbons are known to cause reduced feeding, slow growth and development, respiratory problems, and the loss of ability to move among aquatic animals. Petroleum hydrocarbons are insoluble in water and are persistent, meaning they can remain in the environment for decades affecting plants, animals, and eventually humans.

*Poor Brook and East Springfield*

39. Poor Brook begins in the vicinity of the Facility and then flows northeast approximately two miles, where it joins the Chicopee River, a tributary of the Connecticut River.

40. Before its confluence with the Chicopee River, Poor Brook flows through the Delta Hills Conservation Area. This 27-acre natural area is the largest open public space in the Neighborhood of East Springfield.

41. One hundred percent of census blocks in the neighborhood of East Springfield have been classified by the Commonwealth and EPA as environmental justice communities because they have the potential to be disproportionately impacted by environmental harms and risks.

42. The tributary creeks and wetlands within the Chicopee River watershed are important in protecting aquatic resources by acting as a natural filtering system for water quality, by preventing downstream flooding, and by providing natural habitats to native species.

**Defendants' Inadequate Implementation of EPA's Stormwater Requirements**

43. Defendants have not submitted any Notice of Intent to be covered by the Stormwater Permit.

44. Defendants have not complied with the terms of the Stormwater Permit. In particular, Defendants have failed to:

   a. prepare a SWPPP for the Facility that, among other things, includes the location of all stormwater outfalls in the SWPPP (violation of section 5.2);

   b. submit a "complete and accurate NOI" for each Facility (violation of section 1.2.1);

   c. ensure that pollutant control measures minimize pollutants in its stormwater discharges (violation of section 2.1);

   d. locate materials, equipment, and activities to contain potential spills (violation of section 2.1.2.1);

   e. evaluate for the presence of and eliminate all non-stormwater discharges at each Facility (violation of section 2.1.2.9);

   f. keep clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff associated with

      dumpsters, and keeping exposed areas free of waste, garbage, and flotable debris (violations of section 2.1.2.2);

g. ensure that stormwater discharges do not cause or contribute to a violation of water quality standards (violation of section 2.2.1);

h. include specific SWPPP provisions applicable to land transportation and warehousing facilities (violation of section 8.P.4);

i. conduct routine and quarterly facility inspections to ensure, among other things, that control measures are functioning correctly and are adequate to minimize pollutant discharges, and ensure timely corrective actions are taken when they are not (violation of sections 3.1 and 3.2); and

j. timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions (violation of section 7.5).

### FIRST CAUSE OF ACTION
**Discharges of Industrial Stormwater Without a Federal Stormwater Permit:
Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

45. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

46. Sulco is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

47. Sullivan is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

48. Poor Brook is a "navigable water" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

49. Every day since August 16, 2015 to the present that Defendants discharged industrial stormwater from the Facility into Poor Brook via the Springfield MS4 without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

50. These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## SECOND CAUSE OF ACTION

### Noncompliance with the Federal Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

51. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

52. Since at least August 16, 2015, Defendants have violated the Stormwater Permit by failing to implement its requirements, as set forth in paragraph 44, above.

53. Each of Defendants' violations of each of the requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

54. These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1.	Require Sulco and Sullivan to obtain coverage under and comply with EPA's federal Stormwater Permit;

2.	Order Sulco and Sullivan to pay civil penalties of up to $55,800 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. § 19.4; 85 Fed. Reg. 1754 (Jan. 13, 2020).

3.	Order Sulco and Sullivan to take appropriate actions to restore the quality of protected areas impaired by its activities;

4.	Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.	Award any such other and further relief as this Court may deem appropriate.

Dated: 12/9/2020

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

_/s/ Nora J. Chorover_

Nora J. Chorover (Bar No. 547352)
Special Assistant Attorney General
Emily K. Mitchell (Bar No.703726)
Attorney
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2200
Nora.Chorover@mass.gov
Emily.Mitchell@mass.gov

ATTACHMENT A
DAYS BETWEEN AUGUST 16, 2015 AND AUGUST 16, 2020
WHEN UNAUTHORIZED STORMWATER DISCHARGES OCCURRED

| Year | Month | Date |
|---|---|---|
| 2015 | August | 16, 22 |
| 2015 | September | 11, 14, 30 |
| 2015 | October | 10, 29 |
| 2015 | November | 11, 20 |
| 2015 | December | 3, 15, 18, 24, |
| 2016 | January | 11, 13, 17 |
| 2016 | February | 4, 6, 9, 17, 24, 25 |
| 2016 | March | 15, 29 |
| 2016 | April | 3, 4, 5, 8, 27 |
| 2016 | May | 3, 7, 25 |
| 2016 | June | 6, 12, 28 |
| 2016 | July | 15 |
| 2016 | August | 2, 11, 13, 14, 22 |
| 2016 | September | 19, 24, 27 |
| 2016 | October | 1, 10, 28 |
| 2016 | November | 16, 20, 30 |
| 2016 | December | 1, 12, 17, 18, 25, 30 |
| 2017 | January | 4, 8, 18, 24, 25 |
| 2017 | February | 8, 10, 12, 13, 26 |
| 2017 | March | 28, 29 |
| 2017 | April | 1, 4, 5, 7, 21, 26 |
| 2017 | May | 6, 14, 26 |
| 2017 | June | 1, 6, 7, 20 |
| 2017 | July | 8, 13, 19, 25 |
| 2017 | August | 3, 5, 6, 23, |
| 2017 | September | 3, 4, 7 |
| 2017 | October | 10, 25, 26, 30 |
| 2017 | November |  |
| 2017 | December | 6, 10, 13, 24, 25 |
| 2018 | January | 5, 13, 17, 24 |
| 2018 | February | 2, 5, 8, 11, 12, 18, 23, 24, 26 |
| 2018 | March | 2, 3, 8, 14 |
| 2018 | April | 3, 4, 7, 11, 16, 17, 26 |

Attachment A, Page 1

| Year | Month | Days |
|---|---|---|
| 2018 | May | 13, 16, 20 |
| 2018 | June | 4, 5, 19, 25, 28, 29 |
| 2018 | July | 4, 7, 18, 23, 24, 26, 27, 28 |
| 2018 | August | 3, 4, 5, 8, 15, 18, 19 |
| 2018 | September | 11, 13, 18, 19, 26, 27, 28 |
| 2018 | October | 2, 3, 12, 28 |
| 2018 | November | 3, 6, 7, 10, 13, 14, 16, 20, 27 |
| 2018 | December | 2, 17, 21, 22, 29 |
| 2019 | January | 1, 6, 9, 20, 25, 30 |
| 2019 | February | 7, 13, 18, 21, 24 |
| 2019 | March | 4, 10, 22 |
| 2019 | April | 1, 8, 13, 15, 16, 20, 21, 23, 27 |
| 2019 | May | 13, 14, 24, 29 |
| 2019 | June | 11, 17 |
| 2019 | July | 7, 12, 23 |
| 2019 | August | 1, 8, 18, 22 |
| 2019 | September | 3, 13 |
| 2019 | October | 8, 17, 20, 23, 28 |
| 2019 | November | 1, 19, 24, 25 |
| 2019 | December | 2, 3, 10, 11, 14, 18, 30, 31 |
| 2020 | January | 19, 26 |
| 2020 | February | 6, 8, 13, 27 |
| 2020 | March | 14, 19, 24, 29, 30 |
| 2020 | April | 10, 14, 18, 22, 27 |
| 2020 | May | 1, 16 |
| 2020 | June | 28, 29, 30 |
| 2020 | July | 4 |
| 2020 | August | 3 |

Attachment A, Page 2